# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

DENNIS MCCARTHY,

                  **Plaintiff,**

-vs-                              **Case No.  6:09-cv-754-Orl-28KRS**

COMMISSIONER OF SOCIAL
SECURITY,

                  **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the Complaint filed by Plaintiff Dennis McCarthy. Plaintiff seeks review of the final decision of the Commissioner of Social Security denying McCarthy's claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration ("SSA"). Doc. Nos. 9, 10. The case was referred to me for issuance of a Report and Recommendation.

## I.     PROCEDURAL HISTORY.

Dennis McCarthy applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.* (sometimes referred to herein as the Act), on August 21, 2006. R. 55-58, 280-85. McCarthy initially alleged that he became disabled on June 15, 1999. R. 55, 280.

McCarthy's applications were denied initially and upon reconsideration.  R. 41-43, 48-52, 286-94.

McCarthy requested a hearing before an Administrative Law Judge (ALJ).  A hearing was held on November 18, 2008.  R. 40, 295-321.  McCarthy, represented by an attorney, testified at the hearing.  R. 298-310.  Vocational expert (VE) Jackson C. McKay also testified.  R. 311-20.  At the hearing, McCarthy requested that his disability onset date be amended to August 21, 2006.  R. 297-98.  McCarthy dismissed his claim under OASDI because this date was after the date he was last insured under OASDI and, therefore, he was not eligible for OASDI benefits with this amended onset date.  *Id.*

After considering the testimony and the medical evidence presented, the ALJ found that McCarthy had not engaged in substantial gainful activity since the alleged onset date of his disability.  R. 14.  The ALJ concluded that the medical evidence showed that McCarthy had the following severe impairments: diabetes mellitus, amputation of a toe on the left foot, and loss of a finger on the left hand.  *Id.*  These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[1]  *Id.*

The ALJ found that McCarthy had the residual functional capacity (RFC) to perform light work[2] and specifically, that McCarthy could sit up to 8 hours, stand/walk 2 hours per day

---

[1]  The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

[2]  Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or

or 20 minutes at a time during an 8-hour workday; could lift 20 pounds occasionally or 10 pounds frequently; could only use his left hand as a helper hand with no gripping; could not walk on uneven surfaces or operate foot controls; could not crawl or climb ladders/scaffolds; could not work at unprotected heights; and could not work around hazardous machinery or motorized vehicles.  R. 15.

In reaching this conclusion, the ALJ found that McCarthy's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that McCarthy's statements about the functional limitations of those symptoms were not entirely credible.  R. 16.  The ALJ cited to evidence of record on which he relied to support the credibility determination.  R. 15-16.

The ALJ found that McCarthy was not capable of performing his past relevant work. R. 17.  Based on the testimony of the VE, the ALJ concluded that there were jobs in the national economy that McCarthy could perform, including counter clerk, DOT number 249.366-010, an unskilled, light duty position with a SVP[3] of 2; a ticket seller, DOT number 211.467-030, an unskilled, light duty position with an SVP of 2; and a surveillance system monitor, DOT number 378.367-010, an unskilled, sedentary position with an SVP of 2.  R.

---

when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967.

[3] Specific Vocational Preparation (SVP) refers to "[t]he amount of time required to learn the techniques, acquire information, and develop the facility needed for average performance in a specific job-worker situation."  SSA, DI 25001.001; U.S. Emp. Svc., *Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles* (SCO) 472.  An SVP of 2 corresponds to a period between a short demonstration and one month.  *Id.*

17-18.  The ALJ thus determined that McCarthy was not disabled at any time after the alleged onset date.  R. 18.

McCarthy requested review of the ALJ's decision.  R. 8.  The Appeals Council denied McCarthy's request for review on March 27, 2009.  R. 4-6.  McCarthy timely sought review of this decision by this Court.  Doc. No. 1.

## II.      JURISDICTION.

Plaintiff having exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.     STANDARD OF REVIEW.

To be entitled to disability benefits under SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

IV.     STATEMENT OF FACTS.

After a thorough review of the record, I find that some of the facts are stated in the ALJ's decision and the memoranda of the parties.  Therefore, I will only summarize the relevant evidence and discuss the information in the records submitted by McCarthy in support of his memorandum of law in order to protect McCarthy's privacy to the extent possible.

*A.     McCarthy's Written Statements and Testimony.*

McCarthy was born in 1964.  R. 298.  At the time of the ALJ's hearing, he was 5'10" tall and weighed 260 pounds.  R. 298.  He was right handed. He had a high school education.  R. 299.

Ten years before the ALJ's hearing, he was involved in a hit and run accident in which his left hand was "crushed off."  R. 305-06.  His hand was reattached but he did not have much feeling in it and did not have full grip strength.  R. 306.  He could use his left hand to pick up a water glass if he pushed the glass into his hand.  He could pick up a pencil with his left pinky with difficulty.  R. 310.  He did not use his left hand to any significant extent but used it to help with other tasks such as using it for balance when carrying something.  R. 310.   He went back to work and overcame that injury.  R. 306, 308.

His last employment was in the family pool business as a bulldozer foreman in June of 1999.  R. 85, 299-300.  He was a working foreman and had to perform the job duties as well.  R. 299.  His duties included digging, plumbing, tile work and sealing pools.  He worked in that position for over 15 years.  R. 300.  He closed that business in July of 1999, prior to

any alleged disability, because he "couldn't take the heat anymore." R. 301. He did not work at all after July 1999. R. 301.

He applied for disability benefits in 2006 when he discovered he was diabetic and had his big toe and part of his foot amputated. R. 301. In a disability report, he listed the conditions that limited his ability to work as: diabetes and partially amputated left hand and left foot. R. 103.

McCarthy's diabetes caused pain and burning in his leg, mostly below the knee and in his feet. He felt like he was walking on hot coals on the soles of his feet and like someone was poking needles into his legs. R. 302. On some days he could handle the pain, and then the next day, he could not handle the pain. Some days he went outside and some days he only went from the bed to the sofa. When he walked, he did not have sensation in his feet. He would look down and watch his feet because if he stepped on an unlevel area, his ankle "goes over." R. 303. He was able to walk from the car to the hearing room, as long as there were no stairs. *Id.* During the day, he would walk around the house until pain or swelling in his foot caused him to lie down. R. 84.

His pain was episodic and would appear suddenly. These episodes occurred 8 to 10 times per week, during which he would sit or lie down, moving from time to time to keep his mind off of the pain. R. 304, 307. The episodes of pain lasted a couple of hours. The pain and burning in his leg occurred in any position. His feet swelled more than usual when he walked any distance. R. 70, 305. He could not stand or walk longer than 2 hours following surgery on his left foot because of pain and swelling. R. 83, 85.

He took the medication Gabapentin, the generic form of Neurontin, for his diabetes and neuropathy. R. 70, 304. Gabapentin helped with his steadiness when he stood or walked and helped him to better control his feet. He did not take narcotic pain pills or sleeping pills. R. 305, 307. He took Aleve sometimes for the pain. R. 111, 307. Medications helped somewhat but did not completely relieve his pain, and he had no side effects from the medications. R. 70.

He did not believe he could work because he did not know from day to day how he would feel. R. 307-08. When he was in pain, he was too uncomfortable to do anything. R. 308. He would not be reliable at a job because he would not show up if he was in pain. R. 308.

On April 11, 2007, he went blind in his left eye, but his sight was returning. R. 71. His vision was almost completely back, after a vitreal hemorrhage due to diabetes and seeing cobwebs for a while. R. 309.

McCarthy lived with his mother. R. 307. McCarthy vacuumed at home. R. 306. His mother prepared meals and did housework. R. 71. He could drive an automatic transmission car. R. 307.

    *B.    VE Testimony.*

The ALJ posed the following hypothetical to the VE:

> I want you to assume an individual 44 years old with the work background and education as testified to by the Claimant. I want you to assume the individual can sit up to eight hours per day, stand or walk up to two hours per day, up to 20 minutes at a time, lift up to 20 pounds occasionally, 10 pounds frequently. I want you to assume though that use of the left hand, which is the non-dominant hand, is being limited to what I call helper hand use as discussed in the testimony, where you're using it to – almost in a club like fashion to hold

something down or just underneath something, not using the hand for gripping. Okay? I want you to also assume that walking could not be on uneven surfaces, no use of foot controls, bending and stooping would be occasional, no crawling, occasional stairs, no ladders, ropes or scaffolds, occasional crouching or kneeling, no work around unprotected heights, and no work around moving and hazardous machinery or driving motorized vehicles. . . . Is there other work within the regional or national economy such an individual could perform?"

R. 312-13. The VE testified that although the ALJ's hypothetical would eliminate most light duty positions, there were jobs in significant numbers for the light duty positions, based on the VE's observation of how those jobs were performed. R. 314-15. Specifically, these jobs could be performed primarily with one hand. R. 315-17. The VE responded that such an individual could perform the job of counter clerk, DOT number 249.366-010, a light duty position with an SVP of 2, the job of ticket seller, DOT number 211.467-030, a light duty position with an SVP of 2, and the job of surveillance system monitor, DOT number 379.367-010, a sedentary position with an SVP of 2. R. 313.

If the ALJ found that McCarthy was in pain such that he could not work for a couple of hours a day, however, the jobs would be eliminated. R. 317.

C.      Treating Physicians.

On July 24, 2006, McCarthy was treated at Halifax Medical Center for complaints of ulcers and calluses on his great toes for months prior. R. 124-36. He was diagnosed with new onset diabetes. R. 124, 128, 136. The records noted that McCarthy had a finger amputated from his left hand ten years ago. R. 124. On July 25, 2006, Eric Goldenberg, DPM, performed surgery, which included incision and drainage of the left foot abscess with amputation of the left big toe and debridement of ulceration on the right big toe. R. 121-23.

McCarthy developed a subsequent infection and underwent a partial resection of his toe and primary closure of his wound on the left foot.  R. 118-19, 132.

Following his surgery, McCarthy saw Dr. Goldenberg on August 14, 2006.  Dr. Goldenberg noted that McCarthy was "doing very well."  R. 163.  McCarthy was dizzy and thought the dizziness was caused by his blood pressure medication.  He had been staying off his left foot.  The right toe was debrided, and his left foot wounds were completely healed. Dr. Goldenberg discussed diabetic shoes with McCarthy.  R. 163.

On August 21, 2006, McCarthy treated at Halifax Dunn Health Center for his diabetes and wounds on his feet. He complained of pain in his left foot.  R. 236.

At an appointment with Dr. Goldberg on August 24, 2006, McCarthy was again "doing very well," with some swelling on his left foot.  R. 161.  McCarthy was noted to be taking blood pressure and diabetes medications as well as Naproxen (a non-steroidal anti-inflammatory). R. 161-62.  McCarthy reported he had received Naproxen at the Dunn Clinic because of foot pain.  Dr. Goldenberg stopped the Naproxen and put him on Darvocet (a narcotic pain medication).  McCarthy's left foot was healed with no signs of infection or cellulitis.  The right toe had an ulceration which was debrided and also showed no signs of infection or cellulitis. Dr. Goldenberg again discussed diabetic shoes with inserts with McCarthy.  McCarthy was instructed that when he was standing, he needed to wear a sandal.  R. 161.

McCarthy complained of dizziness at Halifax Dunn Health Center on August 29, 2006. His blood pressure medications were changed.  R. 235.

On September 7, 2006, McCarthy returned to Dr. Goldenberg.  McCarthy's foot swelling had increased and he had large amounts of pitting edema.  The surgical site on his

left foot was completely healed.  On the right toe, he still had hyperkeratosis (thickening of the outer layer of skin) under the toe.  The right toe was debrided and no ulceration was seen, but there was a pre-ulcerative lesion present.  Dr. Goldenberg again discussed diabetic shoes with McCarthy.  R. 160.

On September 26, 2006, McCarthy complained of increased swelling in his left foot which was worse at the end of the day.  Dr. Goldenberg diagnosed edema of the legs, worse in the left leg.  McCarthy was advised to request a diuretic from his primary care physician and to wear diabetic shoes.  R. 159.

McCarthy continued to treat at the Halifax Dunn Health Center for his diabetes.  On October 2, 2006, he reported pain and swelling of his left foot.  R. 232.

On October 9, 2006, McCarthy had drainage coming from the right big toe.  The swelling in his legs had decreased due to taking a diuretic.  Dr. Goldenberg debrided the right toe and it appeared to be clean and without signs of infection.  McCarthy had obtained tennis shoes which he cut open and did not wear tightly.  Dr. Goldenberg recommended changing the toe dressings daily and wearing his shoes at all times.  R. 157.  On October 16, 2006, McCarthy still had ulceration and drainage on his right toe, and some hyperkeratotic tissue was present.  There were no signs of infection or cellulitis.  Dr. Goldenberg debrided the right toe and adjusted McCarthy's shoe insert.  Dr. Goldenberg diagnosed diabetic neuropathy ulceration of the right big toe.  R. 156.

Dr. Goldenberg referred McCarthy to Christopher B. Murphy, DPM.  Dr. Murphy first treated McCarthy on November 6, 2006.  McCarthy had an ulceration and wound on his right big toe.  R. 198.  McCarthy had decreased neurological response in both feet, ankles and

legs. McCarthy had limited range of motion and muscle strength in both feet and ankles due to chronic Charcot[4] changes, most notably on both mid feet. Dr. Murphy diagnosed possible osteomyelitis and cellulitis of the right big toe; chronic Charcot foot deformity, bilaterally; and ulceration and wound on the right big toe. Dr. Murphy debrided the right big toe and advised McCarthy to use a wheelchair and crutches and to be completely nonweightbearing. Dr. Murphy counseled him on the importance of extra-depth shoes and custom accommodative inserts. R. 199.

X-rays performed on November 6, 2006 showed interval resolution of the subcutaneous air within the medial aspect of the right great toe compared with the previous examination; no significant change in the arthritic changes and posttraumatic changes involving the right foot; and possible osteonecrosis involving the second metatarsal head which was stable compared to the previous examination. R. 201.

On November 13, 2006, McCarthy reported he was wearing extra-depth sneakers with temporary inserts and was using crutches to the best of his ability. McCarthy's swelling and redness had decreased and his neurovascular symptoms were noted to be consistent with neuropathy and palpable pedal pulses. Dr. Murphy's assessment was: chronic Charcot arthropathy; painful diabetic neuropathy, exostosis; improved cellulitis of the right toe;

---

[4] "Charcot's arthropathy is a complication of diabetic neuropathy; due to the neuropathy, the bones in the foot become weakened and fracture without major trauma." *Williams v. Captain D's, LLC*, No. 3:07CV49TSL-JCS, 2008 WL 1745189, *3 (S.D. Miss. Apr. 11, 2008). Another definition provides as follows: "A Charcot joint is a diseased joint marked by degeneration or destruction of the bone and cartilage, causing the joint to become deformed and unstable." *Cline v. Horowitz*, No. 1:06CV70079, 2006 WL 3196780, *1 n.1 (W.D. Va. Nov. 5, 2006)(citing 2 J.E. Schmidt, *Attorney's Dictionary of Medicine* C-187 (2004)).

ulceration and wound of the right toe. R. 194, 196. Dr. Murphy debrided the right toe and advised McCarthy to see an orthotist for extra-depth shoes and custom inserts. He advised McCarthy to control his diabetes with medicine, diet and exercise, and to avoid walking barefoot. R. 195, 197.

On November 20, 2006, Dr. Murphy debrided the right toe and assessed: resolving ulcer of the right big toe; resolved cellulitis; and chronic Charcot foot deformity of the right foot. R. 192-93. Dr. Murphy observed that McCarthy's condition was "complicated by diabetic neuropathy and Charcot foot deformity." R. 192.

On November 27, 2006, McCarthy reported that he had been walking on his toe more because of the holidays. He had extra-depth shoes and custom inserts. McCarthy had a painful bony prominence in his big toe which was exacerbated with pronation (foot rolls inward and the foot arch flattens) while standing and during gait. R. 190. Dr. Murphy's assessment was: exostosis (benign bony growth), right toe; and improved infection, diabetic neuropathy and Charcot foot deformity, ulceration and wound of the right toe. R. 190. Dr. Murphy debrided the right toe and counseled McCarthy to limit weightbearing and to wear the extra-depth shoes with inserts at all times, to elevate his foot and leg above his heart, avoid prolonged standing, and continue with daily dressing changes. R. 191.

On December 4, 2006, McCarthy was diagnosed with painful Charcot foot deformity, exostosis, right toe exacerbated by pronation; diabetic neuropathy; and diabetic ulcer of the right toe. Dr. Murphy noted that McCarthy had decreased sensation in his feet consistent with neuropathy, and pain associated with the Charcot foot deformity. R. 188. Dr. Murphy

debrided the right toe and recommended continuing daily dressing changes, "offloading measures," and extra-depth shoes with inserts  R. 189.

Dr. Murphy noted x-rays and MRI studies as well as bone scans were consistent with infection on December 11, 2006.  McCarthy had decreased sensation consistent with neuropathy.  X-rays were consistent with a Charcot deformity in the right foot which was exacerbated by pronation during gait.  Dr. Murphy assessed: healed ulceration, right toe; and diabetic neuropathy with chronic Charcot changes of the left foot.  Dr. Murphy advised McCarthy to see an orthotist for extra-depth shoes and custom inserts as soon as possible, and to avoid walking barefoot.  R. 184, 186.   McCarthy was advised to follow up with his primary care physician for overall management of his diabetes. R. 184-85, 186-87.

On December 21, 2006, McCarthy had a new ulceration on his left foot.  Dr. Murphy's assessment was ulceration and wound, left foot and healed ulcer of the right foot.  Dr. Murphy again recommended bandages and extra-depth shoes with custom inserts.  R. 183.  As of December 26, McCarthy had been "offloading as directed" since his last evaluation. McCarthy had painful pitting edema to both feet and ankles.  Dr. Murphy diagnosed cellulitis of the left foot and painful chronic venous insufficiency and swelling with ulceration of the left foot.   R. 181.   Dr. Murphy debrided the left foot ulcer and recommended complete nonweightbearing and using a wheelchair as well as wearing extra-depth shoes with custom inserts.  R. 181-82.

 On January 2, 2007, Dr. Murphy diagnosed painful chronic venous insufficiency, chronic Charcot foot deformity of the left foot, diabetic ulcer of the left foot and diabetic neuropathy.  Dr. Murphy debrided the left foot ulcer and advised McCarthy to elevate his foot

and leg above his heart, avoid prolonged standing and to control his diabetes with medicine, diet and exercise. R. 179-80. On January 8, 2007, Dr. Murphy's assessment was improved cellulitis of the left foot, but unresolved chronic Charcot foot deformity, ulceration and wound of the left foot. R. 177. Dr. Murphy debrided the left foot ulcer and advised McCarthy to stay off his foot as much as possible, elevate his foot and leg above his heart, avoid prolonged standing and use his extra-depth shoes and custom inserts. R. 177-78.

On January 15, 2007, Dr. Murphy debrided ulcerations of the right toe and left foot. Examination revealed "a fixed prone position of both feet consistent with chronic charcot changes and charcot arthropathy [joint disease]." R. 175. Dr. Murphy's assessment was chronic Charcot foot deformity, diabetic neuropathy and ulceration and wounds of the right big toe and left foot. R. 175. On January 22, 2007, McCarthy's ulcers were again debrided and Dr. Murphy's assessment was: chronic Charcot foot deformity; healed ulcerations of the right big toe and left foot; chronic venous insufficiency and swelling; and diabetic neuropathy. Dr. Murphy recommended wearing the extra-depth shoes and custom inserts, and to follow up with his primary care physician for treatment of his diabetes and the neuropathy. R. 173. On February 20, 2007, McCarthy had ulcers on his right toe and left midfoot. Dr. Murphy debrided the nail plates and his assessment was pre-trophic diabetic ulcers of the right toe and left midfoot and painful onychomycosis (fungal nail infection) bilaterally. R. 172.

On April 11, 2007, McCarthy treated with Helen Cummins, M.D., for vision problems. He woke up and felt like he was looking through a red lens. R. 206. He was referred to Dr. Dunn. R. 205. McCarthy could not afford to pay for further treatment and did not have insurance, so he canceled the appointment. At that time, McCarthy stated that his vision was

back 60-70%. R. 204. He also reported that his vision was 70% improved to Halifax Dunn Health Center. R. 224.

At a follow up visit with Dr. Cummins on May 23, 2007, McCarthy reported that one week after his last visit, the redness cleared and at that time, he saw cobwebs floating around. R. 202. An MRI of the brain, eyes and optic nerves was normal. R. 223.

McCarthy continued to be treated for his diabetes and blood pressure at Halifax Dunn Health Center. He reported that he felt good on June 7, 2007. R. 222. On July 31, 2007, McCarthy was noted to have diabetic neuropathy and was prescribed Neurontin. R. 264.

As of August 23, 2007, McCarthy's vision was improving and the cobwebs were decreasing. On November 15, 2007, his vision continued to improve. R. 268-69.

McCarthy had a new ulcer on his left foot on August 28, 2007. R. 263.

On June 2, 2008, McCarthy reported an episode of blurry vision about a month prior that lasted one week but slowly improved. R. 266-67.

On four occasions between July of 2007 and April of 2008, McCarthy was fitted with diabetic shoes which included inserts and fillers for his amputation, pressure points and Charcot joint. R. 251.

D.      *Examining Physicians.*

David Carpenter, M.D., examined McCarthy on June 20, 2007 at the request of the SSA. R. 208-15. McCarthy reported chronic pain affecting both feet and ankles and worsening swelling at both feet and ankles over the past year. He also reported pain and paresthesias (tingling or numbness) affecting both feet at rest which was worse with standing and any activity. R. 208. Upon examination, McCarthy had no range of motion of the left

thumb and had decreased sensation to pinprick and light touch throughout the left hand. His range of motion was also restricted in his left wrist. His fine manipulation skills were impaired at the left upper extremity as he had difficulty manipulating buttons and opening doors. He had decreased sensation to pinprick and light touch in both legs from the mid-shin to the toes. He had significant swelling over both ankles and had bilateral pes planus (flat feet) with swelling of both arches. McCarthy walked with a mild bilateral limp. His balance was good, he was steady, and he did not require an assisted device to walk. R. 210.

Dr. Carpenter's impression was: type 2 diabetes; diabetic retinopathy with left-sided vision loss; diabetic peripheral neuropathy status post amputation of left lower extremity first digit with chronic arch callous formation; bilateral pes planus; Charcot joint; and status post trauma to the left hand with amputation of the second digit with impairment of fine and gross manipulations skills. He did not render an RFC assessment. R. 210.

Dr. Dean[5] completed a Visual Evaluation Report following an examination on August 14, 2007. R. 237-41. Dr. Dean diagnosed a mild cataract and diabetic retinopathy in each eye and vitreous hemorrhaging in the left eye. Dr. Dean indicated that McCarthy needed laser treatments to prevent bleeding. R. 237. McCarthy indicated his vision was improving and the red blood was gone, but he was seeing cobwebs. R. 238.

E. *Reviewing Physicians.*

Audrey Goodpasture, M.D., completed a Physical Residual Functional Capacity Assessment on October 31, 2006. R. 164-171. She opined that McCarthy could occasionally

---

[5] The report is not signed, but the record indicates the evaluation was completed by Dr. Dean. R. 2, 270.

lift and/or carry 50 pounds, could frequently lift and/or carry 25 pounds, could stand and/or walk and sit about 6 hours in an 8-hour workday, and could perform unlimited pushing and/or pulling. R. 165.

Donald Morford, M.D., completed a Physical Residual Functional Capacity Assessment on August 24, 2007. R. 242-49. Dr. Morford indicated that McCarthy could occasionally lift and/or carry 20 pounds, could frequently lift 10 pounds, could stand and/or walk and sit about 6 hours in an 8-hour workday, and could perform limited pushing and pulling with his upper extremities. R. 243. McCarthy could occasionally use his left hand and should avoid "extremes." McCarthy could occasionally climb ramps/stairs, should never climb ladder/rope/scaffolds, and could occasionally balance, stoop, kneel, crouch and crawl. R. 244. McCarthy had limited handling, fingering and feeling and was restricted to "zero to occasional use of the left upper extremity." R. 245. He had a limited field of vision. *Id.* McCarthy should avoid concentrated exposure to extreme cold and heat and to vibration, and should avoid all exposure to hazards. R. 246.

## V.      ANALYSIS.

McCarthy asserts that the ALJ erred in many respects. He submits that the ALJ erred by failing to find that his neuropathy and bilateral Charcot foot deformity were severe impairments, by failing to consider the Charcot foot deformity in determining McCarthy's RFC, by establishing an RFC that was not supported by the medical evidence, by failing to obtain a medical source statement regarding RFC from a treating or examining physician, and by failing to state the weight applied to the opinions of treating, examining, and non-examining sources. Most of these arguments arise from the contention that the ALJ did not properly

evaluate the functional limitations arising from McCarthy's diabetic neuropathy and Charcot foot deformity. Accordingly, I will address only these issues in the context of these two medical conditions.[6]

Although the medical record is replete with findings that McCarthy had both diabetic peripheral neuropathy and Charcot foot deformity, the ALJ did not find either of these conditions to be severe at step two of the sequential evaluation. This may be due, in part, to McCarthy's failure to list neuropathy and Charcot foot deformity as impairments separate from diabetes mellitus in his disability reports and at the ALJ's hearing. Because the failure to find a condition severe at step two is harmless if the ALJ considers the conditions later in his evaluation, *See, e.g., Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993); *Simmons v. Comm'r*, No. 6:08-cv-1407-Orl-DAB, 2009 WL 2973622, at *3 (M.D. Fla. Sept. 14, 2009), it is appropriate to determine whether the ALJ considered these impairments elsewhere in his decision.

The ALJ did acknowledge functional limitations from neuropathy in determining McCarthy's RFC. He wrote: "Secondary to peripheral neuropathy, the claimant can only stand and/or walk 2 hours a day or 20 minutes at a time." R. 16. The ALJ did not refer anywhere in his decision, however, to Charcot foot deformity, either as a condition incident to diabetes or peripheral neuropathy or as a separate impairment.

The Commissioner argues that the omission of a discussion of Charcot foot deformity is harmless because a diagnosis of peripheral diabetic neuropathy "refers to neuropathy with

---

[6] The parties were advised that issues not specifically raised would be waived. Doc. No. 11.

manifestations in the legs and feet." Doc. No. 13 at 10. The argument continues that there is no evidence that the Charcot foot deformity caused more functional limitations that those incident to the diabetic neuropathy. *Id.* Therefore, the Commissioner asserts, "Charcot foot is not a separate impairment from peripheral diabetic neuropathy. Id. It is simply another manifestation of Plaintiff's peripheral diabetic neuropathy. Id." Doc. No. 13 at 11.

The "Id." citations by the Commissioner in this argument appear to be references to the immediately preceding record reference "Tr. 242-49," which is the RFC assessment of Dr. Morford, a reviewing physician. Dr. Morford, however, did not reference Charcot foot deformity in that report. The Commissioner also refers to the opinion of Dr. Goodpasture, the other reviewing physician, but Dr. Goodpasture likewise did not comment on the Charcot foot deformity diagnosis. R. 164-71.

In contrast, Dr. Murphy, McCarthy's treating physician who diagnosed Charcot foot deformity, discusses that condition separately from neuropathy. He opined that McCarthy had limited range of motion and muscle strength in both feet and ankles due to chronic Charcot changes, most notably on both mid feet. R. 199. He observed that McCarthy's condition was "complicated by diabetic neuropathy *and* Charcot foot deformity." R. 192 (emphasis added). Dr. Murphy also noted that McCarthy had decreased sensation in his feet consistent with neuropathy, and pain associated with the Charcot foot deformity, again illustrating that Dr. Murphy assigned separate limitations arising from neuropathy and Charcot foot deformity. R. 188. He also required that McCarthy reduce weight bearing on his feet due to the Charcot foot deformity. *See* R. 177-78. Thus, the Commissioner's argument that there is no conflict

in the record regarding limitations associated with Charcot foot deformity separate from those associated with peripheral neuropathy is not supported by the record.

Under these circumstances, it was important for the ALJ to state the weight given to Dr. Murphy's opinion and explain why the ALJ concluded that the Charcot foot deformity did not result in functional limitations in addition to those arising from peripheral neuropathy. *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir.1981)(An ALJ must "state specifically the weight accorded to each item of evidence and why he reached that decision."). Instead, the ALJ's decision is bereft of any mention of Dr. Murphy's treatment records, which are exhibit 4F. Because the ALJ did not address Charcot foot deformity on his analysis, the decision is insufficient for this Court to determine whether substantial evidence supports his conclusions.

McCarthy submits that the Court should direct the Commissioner to award benefits to him based on the errors below. The Court may order an award of benefits only "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993) (citing *Bowen v. Heckler*, 748 F.2d 629, 635-36 (11th Cir. 1984)); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). Because the Commissioner has not yet properly evaluated the evidence, it is not clear that McCarthy is disabled without any doubt. Therefore, remand for an award of benefits is not appropriate.

## VI.     RECOMMENDATION.

For the reasons set forth herein, it is **RESPECTFULLY RECOMMENDED** that the decision of the Commissioner be **REVERSED** under sentence four of 42 U.S.C. § 405(g), and **REMANDED** for further proceedings consistent with the Court's order. I further recommend

that the Court direct the Clerk of Court to issue a judgment consistent with its order on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended this 14th day of June, 2010.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record